UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

DEMETRIUS EASTER                    CIVIL ACTION NO. 03-1947-P

versus                              JUDGE WALTER

WARDEN, ET AL.                      MAGISTRATE JUDGE HORNSBY
_____

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Demetrius Easter ("Petitioner") of second degree murder in connection with the death of a thirteen-year-old boy in a drive-by shooting. Petitioner pursued a direct appeal. State v. Easter, 756 So.2d 703 (La. App. 2d Cir. 2000), writ denied, 785 So.2d 28 and 794 So.2d 823 (La. 2001). He raised additional issues in an application for post-conviction relief. He then filed this action seeking federal habeas corpus relief. It is recommended, for the reasons that follow, that the petition be denied.

### Sufficiency of the Evidence; Strickland

Petitioner argues that the evidence was insufficient to support his conviction. This issue was among the assignments of error on direct appeal, but the Court of Appeal did not address the issue because the issue was deemed abandoned due to a failure to brief it. Easter, 756 So.2d at 708. Petitioner made the argument again in his post-conviction application, but the district court, without addressing the merits, rejected the claim under La. C. Cr. P. art. 930.4, which provides that an issue will not ordinarily be considered in a post-conviction

application if the issue was raised in the trial court and inexcusably not pursued on appeal. Tr. 672. The Court of Appeal denied a writ application with a brief opinion that merely summarized the issues and concluded that Petitioner "has failed to demonstrate that the trial court erred in denying these claims." Tr. 710. The Supreme Court of Louisiana denied writs without comment. Tr. 778.

The last reasoned state court opinion clearly and expressly relied on a procedural bar with respect to the sufficiency claim. The claim is, therefore, subject to a procedural bar defense that would preclude federal review absent a showing of cause and prejudice. Ylst v. Nunnemaker, 111 S.Ct. 2590 (1991); Bell v. Cain, 2002 WL 31002831 (E. D. La. 2002) (Article 930.4(C) is an independent and adequate procedural bar). Petitioner did not respond to the invocation of the bar defense by attempting to show cause and prejudice, but his original petition did assert an ineffective assistance claim under Strickland v. Washington, 104 S.Ct. 2052 (1984) based on the abandonment of the sufficiency issue on appeal. Ineffective assistance may also constitute cause. The sufficiency claim will, therefore, be addressed, but in the context of a Strickland claim for ineffective assistance on appeal.

Persons convicted of a crime are entitled to effective assistance of counsel on their first appeal of right. Evitts v. Lucey, 105 S.Ct. 830 (1985). Counsel's performance on appeal is judged under the familiar two-prong Strickland test. On appeal, effective assistance of counsel does not mean counsel who will raise every non-frivolous ground of appeal available. It means counsel who will perform in a reasonably effective manner. Green v.

Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998) (citing Evitts). The petitioner must show that counsel's failure to raise an issue on appeal rendered the entire proceedings –– trial and appeal –– fundamentally unfair. This is a heavy burden of establishing actual prejudice and not merely that an error had some conceivable effect on the outcome of the proceeding. Givens v. Cockrell, 265 F.3d 306, 310 (5th Cir. 2001).

Clayton Edwards, who was 17 at the time of the crime, testified that he was with Demario Jenkins (the victim), Derrick Jenkins (the victim's brother) and Christopher Small on the day of the shooting. The four young men were in a park in the Hollywood Heights area of Shreveport. As they were leaving the park, a group of about three young men and two young women in a Cadillac were also leaving. Edwards, who admitted he is a member of the Rolling 60's Crips, said some of the people in the Cadillac began "throwing up gang signs and hanging out the window and stuff" and "was throwing up Blood (gang signs) out the window" like they were "getting ready to do a drive-by or something." Edwards testified that he was scared, so he fired three shots in the air from his .380 caliber pistol. His group then ran away.

Edwards testified that his group saw the Cadillac again about 50 minutes later as they were walking on Haywood, up the street from the park. He first heard the sound of an engine revving like a car accelerating. He then heard about four shots that sounded like they came from a handgun, followed by several shots from what sounded like an assault rifle. Once the

shooting started, it did not stop until what Edwards estimated was more than 50 rounds were fired. Edwards was hit in the knee and fell to the ground.

Edwards identified Petitioner in the courtroom as one of the persons he saw at the park that day. He said that as he was falling, he could see flashes of gunfire coming from the car and someone with "a big Afro" in the car, and he remembered that Petitioner had an Afro at the park. Edwards admitted on cross-examination that he told the police on the day of the shooting that Larry Smith, the driver of the car and a person Edwards knew, shot him. He also admitted that he did not actually see Petitioner shooting at him; he saw only the Afro in the car. Tr. 224-240.

Christopher Smalls testified that he, Clayton Edwards, the Jenkins brothers and Paul Pierce went to the park that day to play basketball. He saw at the park Larry Smith, whom he knew, Petitioner (whom he identified in the courtroom) and two females. As Petitioner's group in the Cadillac approached Smalls' group, the persons in the Cadillac began throwing gang signs, which made Smalls' group think the persons in the Cadillac were going to shoot. Clayton Edwards fired some shots, and the boys ran.

Smalls testified that when they saw the Cadillac again on Haywood Street, the occupants began firing at them as soon as the groups saw each other. Smalls was hit three times, and he estimated that at least 50 shots were fired from the car. He testified that the gunfire was coming from both the front and back seats of the passenger side. The car

stopped and the shooting continued, as if they were "trying to make sure they killed us." Smalls said the victim was hit as he tried to run away.

The police came to Smalls' house and showed him a photographic lineup. Smalls identified Petitioner as being at the park and in the car. He made the in-car identification based primarily on Petitioner's hair. Smalls said he got just a glimpse of Petitioner in the car "because he had the AK, and he was shooting, so many bullets would come out, I just had a glimpse, and I couldn't really see anything but hair." Smalls admitted on cross-examination that he based his identification of Petitioner as being in the car on the hair he saw and the fact that he saw Petitioner with the driver of the car less than an hour earlier. He added that the pistol fire came from the back seat and the AK-47 fire was from the front seat. Tr. 240-56.

Larvaris Jenkins, the victim's stepbrother, testified that he was at his nearby home at the time of the shooting. He saw a gray Cadillac speed past his house and then return about 30 minutes later. When the car passed the second time, Jenkins saw someone putting a "clip" in a gun. He recognized Larry Smith in the car and also saw "another dude in there with a red shirt on, with a big 'fro." Jenkins identified that person as Petitioner, and he testified that he had earlier picked Petitioner from a photo lineup. He said that Petitioner was in the front, passenger seat of the car, and he was certain he had identified the right person. Tr. 256-68.

Rasheika Reed testified that on the day of the shooting her boyfriend, Larry Smith, came to her house with a man he introduced as Papoo. Ms. Reed identified Petitioner as Papoo. Ms. Reed and her sister, Chaka, went with the men to the park. The girls watched

the boys play basketball and saw some other boys at the other end of the court spraying Crips and Rolling 60's graffiti. As Ms. Reed's group drove out of the park in Smith's Cadillac, the other group fired some shots.

Ms. Reed testified that her group went in the Cadillac to Queensborough, where Papoo went into a house and came out with something under a towel, which he put in the trunk of the car. They then drove around the corner to see a friend named Duke (whose real name is Addaryl Wesley). Duke went to his house, came out with something under his shirt, and got in the back seat of the car. The group returned to the Hollywood Heights area. Larry stopped the car, and Papoo got out and took his gun from the trunk. Duke got his weapon out of his shirt. Papoo took the front passenger seat, and Duke got in the back.

Ms. Reed testified that, as the Cadillac rounded a curve, the boys spotted the targets and yelled for the girls to get down. Papoo and Duke then started shooting for a couple of minutes. Afterwards, Larry took everyone home. Ms. Reed admitted on cross-examination that she had given an inconsistent statement to police before her mother had a hard talk with her. By the time of a pretrial hearing, Ms. Reed's testimony was consistent with what she said at trial. Tr. 269-91.

Chaka Reed offered testimony similar to her sister's. She also placed Papoo, whom she identified as Petitioner, in the front passenger seat. She, like her sister, got down at the time the shots were fired, but she said that she looked up and saw Petitioner and Duke hanging out the window and shooting. Petitioner was shooting a "long, like a chopper, long

gun." Duke had a pistol that Chaka guessed was a 9 mm or .45 caliber. Chaka admitted that she originally gave police a different story because she was scared and was trying to protect Larry Smith, but her mother convinced her to tell the truth. She described Petitioner's hairstyle at the time of trial as "kind of long" and said that his hair had been shorter at the time of the crime. Tr. 296-310.

Larry Smith pleaded guilty to manslaughter shortly before trial began. He also pleaded guilty to an unrelated armed robbery. He had not been sentenced at the time of trial, but he testified that the district attorney had not asked him to testify or made any promises in exchange for his testimony. Rather, his defense counsel had suggested that he cooperate, and he took the advice. Smith gave testimony similar to that of the Reed sisters about the events at the park and the retrieval of weapons. Smith said that as they looked for the boys he "came to my senses" and realized he was not doing the right thing, so he began driving in the direction to take the girls home. But almost immediately, either Petitioner or Duke said, "There the niggers go right there" and started shooting. According to Smith, Petitioner was in the front passenger seat shooting an AK-47, and Duke was in the rear passenger seat shooting a .40 caliber pistol. Smith heard after the shooting that a detective had called the Reed sisters' house, and he soon turned himself in. He told the investigating detectives and a grand jury the same facts he offered at trial. Tr. 311-33.

Police officers testified about the collection of evidence. The murder weapon was not recovered. The coroner testified that the victim had a non-fatal wound to his left hand and fatal bullet wound caused when a bullet entered the right side of the victim's back, passed

through his body and exited through the right collar bone. In passing through the right side of the chest, the bullet made a large hole in the victim's right lung, causing him to bleed to death internally. Tr. 357. The prosecutor asked Dr. McCormick if he could identify the caliber of the weapon that fired the fatal shot but, before the witness could answer, the prosecutor rephrased the question as whether the wound was "consistent with a large caliber weapon." Dr. McCormick answered yes. Tr. 358. There was no further elaboration as to whether the fatal wound was fired from a rifle or handgun.

Petitioner attacks the sufficiency of the evidence on several grounds. He argues that Larry Smith was not credible because Smith received a mere ten-year sentence for manslaughter a week after the trial. Petitioner also complains that the prosecutor struck a deal with Smith before trial but allowed him to testify falsely that there was no deal. That issue was addressed extensively during Smith's testimony, and there is no evidence there or elsewhere to support Petitioner's conclusory claim. Petitioner also points to what he believes are inconsistencies in some of the testimony, and he argues that the physical evidence (such as the location of spent casings found at the scene) could support a theory that Smith was both driving the car and shooting the rifle.

The undersigned has no doubt that, had counsel raised and fully briefed a sufficiency of the evidence argument on direct appeal, the conviction would nonetheless have been affirmed. Several witnesses gave consistent testimony that Petitioner was riding in the front seat and firing a rifle at the victim, who died from a gunshot wound. Second degree murder, as charged in this case, is the killing of a human being (1) when the offender has a specific

intent to kill or to inflict great bodily harm or (2) when the offender is engaged in the perpetration of certain enumerated crimes, including drive-by shooting, even though he has no intent to kill or inflict great bodily harm. Under the second prong, a felony-murder theory, Louisiana law permits a person to be convicted as a principal[1] to second degree murder even if he did not himself possess specific intent to kill or inflict great bodily harm. Petitioner could, therefore, be convicted of second degree murder even if Duke fired the fatal shot.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The arguments raised by Petitioner are perhaps good arguments to have made to the jury, but once the jury assessed the credibility of the witnesses, resolved any conflicts in the evidence and made its decision, the verdict is no longer subject to reversal, under the Jackson standard, based on such arguments. Accordingly, counsel was not ineffective for failing to brief the issue on appeal.

---

[1] La. R.S. 14:24 provides: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

**Jury Instruction**

Petitioner argues that the trial judge's jury instructions erroneously included a charge on the definition of a "principal" that potentially confused the jury and relieved the prosecution of its burden of proof on the question of intent. Counsel did not object to the instruction at trial or suggest alternative instructions or raise the issue on appeal. Petitioner first made this argument in his post-conviction application. The district court, which issued the last reasoned opinion on the issue, held that the claim was waived by the lack of contemporaneous objection. It held, in the alternative, that the claim was without merit. Tr. 672. That raised a procedural bar to federal habeas relief absent a showing of cause and prejudice. Fisher v. State of Texas, 169 F.3d 295, 300 (5th Cir. 1999) (procedural bar effective even if state court alternatively reaches the merits); Higginbotham v. Cain, 2006 WL 846733 (E. D. La. 2006) (Louisiana's contemporaneous objection requirement for jury instructions is an independent and adequate procedural bar). But the issue must be addressed because, as with the sufficiency issue, counsel's lack of objection to the instruction is included as a component of Petitioner's ineffective assistance of counsel claim.

Petitioner first raised this claim in his post-conviction application (Tr. 656-57). The state responded to the various ineffective assistance arguments with a brief and an affidavit from defense counsel John Michael McDonald (now deceased) who addressed some of the claims about failure to investigate and prepare for trial but did not address the jury instruction issue. Tr. 671. The state court recited the relevant Strickland standard and rejected claims that counsel was deficient for (1) not objecting to an amendment to the indictment and (2)

being unprepared. There was no mention of the claim that counsel should have objected to the jury instruction.

When a state court ignores an issue, it arguably prevents the federal courts from affording any deference to the state court's decision. At least one court has reasoned that the federal court is put in the position of having to conduct a de novo review of the claim because deferential review is available under Section 2254(d) only where the state court has adjudicated the claim on the merits. Tatum v. Cockrell, 2001 WL 1516756 (N. D. Tex. 2001) (state court ignored issue; no adjudication on the merits). But the habeas jurisprudence also indicates that adjudication on the merits includes any decision that is substantive as opposed to a decision based on procedural grounds. Salazar v. Dretke, 419 F.3d 384, 394-95 (5th Cir. 2005). And the federal courts are to review a state court's decision, not the reasons for the decision, even if no reasons are provided. Santellan v. Cockrell, 271 F.3d 190, 193-94 (5th Cir. 2001). See also Summers v. Dretke, 431 F.3d 861, 868 (5th Cir. 2005). Although deference may be due the state court's decision, even though the state court wholly ignored or overlooked the issue, the undersigned will conduct a de novo review out of an abundance of caution.

The backdrop for judging whether counsel's performance was objectively unreasonable is the jurisprudence that renders unconstitutional jury instructions that create presumptions of intent or otherwise shift the burden of proof to the defendant with respect to intent. Sandstrom v. Montana, 99 S.Ct. 2450 (1979). The law also prohibits a jury instruction that permits a conviction for a crime that has an element of specific intent based

on a mere finding that the defendant knew of the unlawful intent of a co-defendant or other principal who physically committed the crime. <u>See</u> <u>Robertson v. Cain</u>, 324 F.3d 297, 302-03 (5th Cir. 2003).

Petitioner argues that counsel should have raised a <u>Sandstrom</u> objection to the trial judge's preliminary instructions that included a definition of principal, which includes all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime. Tr. 215-16. <u>See also</u> La. R.S. 14:24. If the charge were first degree murder as it was in <u>Robertson</u> or if the prosecution were proceeding only under the version of second degree murder that requires specific intent to kill or inflict great bodily harm, the principal instruction would be troublesome. But in this case the state also pursued a felony-murder theory of second degree murder that permits a conviction if the defendant was engaged in the perpetration or attempted perpetration of a drive-by shooting, even though the perpetrator had no intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(2)(a).

Louisiana employs the felony-murder doctrine if a killing is committed during the commission or attempted commission of any of several enumerated felonies. Louisiana law provides that specific intent to kill or inflict great bodily harm is *not* a necessary element to be a principal to second degree murder that occurs during the course of such a felony. <u>State v. Touchet</u>, 847 So.2d 746, 748 (La. App. 3d Cir. 2003); <u>State v. Gurganus</u>, 864 So.2d 771,

775 (La. App. 5th Cir. 2003) ("One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder.").

The trial judge's preliminary and final instructions made clear that, to convict for second degree murder, the jury had to find beyond a reasonable doubt that:

> The defendant Demetrius Easter killed Demario Jenkins and that he acted with specific intent to kill, or to inflict great bodily harm; ***or*** that the defendant Demetrius Easter killed Demario Jenkins and that Demetrius Easter was engaged in the perpetration or attempted perpetration of a drive-by shooting, even though he had no intent to kill or to inflict great bodily harm.

Tr. 216-17 and 430-31 (emphasis added). The inclusion of the principal instruction was relevant to the felony-murder theory of the prosecution, so counsel was not ineffective for his lack of objection to the instructions. The instruction did not violate Sandstrom because it did not shift to the defendant the burden of proof regarding intent and it did not wrongfully allow conviction of a specific-intent crime based on the intent of a fellow principal.

Assuming counsel should have objected, the prejudice prong of the Strickland test is not met. It is almost certain that the court would have overruled the objection in light of the Louisiana law cited above. Petitioner argues that the lack of objection destroyed his defense that Larry Smith was the actual shooter of the rifle, but (1) there was no significant evidence to support that purported defense and (2) Petitioner would have still been guilty under the felony-murder prong of second degree murder. Counsel's lack of objection was not deficient performance and, furthermore, no prejudice stemmed from his inaction.

**Closing Argument**

Petitioner argues that the trial court violated his Sixth Amendment right to a fair trial when it prevented defense counsel from arguing that the jury should return a verdict of manslaughter because Larry Smith was permitted to plead guilty to that lesser crime. The trial judge refused a request that counsel be allowed to make the argument, reasoning that the argument would improperly appeal to sympathy, passion or prejudice. He noted that he would not allow a prosecutor to argue that a defendant should be found guilty of a certain crime just because a co-defendant pleaded guilty to that crime. The trial judge did allow counsel to make reference to Smith's manslaughter plea, but he refused to permit a straightforward argument that Petitioner was entitled to a similar verdict. Tr. 394-95.

Petitioner raised the issue on direct appeal, but solely in terms of state law. Tr. 474-75. There was no reference to federal jurisprudence or that the judge's action violated a federal constitutional provision. The Court of Appeal observed that defense counsel should be allowed wide latitude in closing argument, and the trial judge, in exercising the discretion he has in controlling the duration and scope of argument, should not place undue restrictions on counsel. The Court of Appeal agreed with the trial judge that the proposed argument was designed to appeal to prejudice and, alternatively, the absence of such argument did not prejudice the defense. Easter, 756 So.2d at 706-07.

Petitioner's failure to frame the issue as a federal one until he arrived in federal court likely precludes granting relief on this claim because a federal claim was not fairly presented

to the state courts and exhausted. See Baldwin v. Reese, 124 S.Ct. 1347 (2004); Duncan v. Henry, 115 S.Ct. 887 (1995).

The claim also lacks merit. The constitution requires that counsel for the defense be able to make a closing argument to the jury, no matter how strong the case for the prosecution may appear to the judge. But that does not mean that closing arguments must be uncontrolled or unrestrained. "The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations." Herring v. New York, 95 S.Ct. 2550, 2555 (1975). He has broad discretion to ensure that the arguments do not "stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." Id. The crucial question in reviewing a limitation on argument is whether counsel was permitted to advocate effectively for his client, and a relevant factor is whether the court's restrictions hampered the jury's ability to understand the information and issues at trial. U.S. v. Gray, 105 F.3d 956, 963 (5th Cir. 1997).

The reasonable restriction imposed in this case did not prevent counsel from arguing to the jury on all relevant factual and legal issues. The proposed argument was not one founded in Louisiana or constitutional law, and the trial judge had no obligation to permit it. Habeas relief is not warranted on this issue.

**The Indictment**

The grand jury returned an indictment for first degree murder. Tr. 6. The district attorney later issued an amended indictment for a lesser charge of second degree murder. Tr. 5. Petitioner argued in his post-conviction application that the trial court erred when it

allowed the prosecutor to amend the charge without action by the grand jury. The last reasoned state court decision of the issue, from the district court, held that Louisiana law permits a district attorney to amend an indictment to charge a lesser, responsive offense. Tr. 672.

The grand jury requirement is applicable to federal prosecutions, but the Supreme Court has held that it is not binding on the states. Campbell v. Louisiana, 118 S.Ct. 1419, 1423 (1998); Hurtado v. California, 4 S.Ct. 111 (1884). See also Freeman v. City of Dallas, 242 F.3d 642, n. 5 (5th Cir. 2001). Thus, habeas relief is not available based on an argument that a charge was instituted by the district attorney rather than the grand jury.

Furthermore, the sufficiency of a state indictment or bill of information is not a matter for federal habeas corpus relief unless it can be shown that the charging instrument "is so defective that the convicting court had no jurisdiction." Morlett v. Lynaugh, 851 F.2d 1521, 1523 (5th Cir. 1988); Dowell v. C.M. Lensing, 805 F.Supp. 1335, 1342-43 (M.D. La. 1992). For a charging instrument to be fatally defective, no circumstances can exist under which a valid conviction could result from facts provable under the instrument. State law is the reference for determining sufficiency and if the issue "is presented to the highest state court of appeals, then consideration of the question is foreclosed in federal habeas corpus proceedings." Morlett, supra. See also McKay v. Collins, 12 F.3d 66, 68-69 (5th Cir. 1994). Petitioner presented his complaints about the charging instrument to the state courts, and they found that the instrument was in compliance with Louisiana law. No relief is available on this claim.

**Ineffective Assistance of Counsel**

Petitioner complains that his counsel was ineffective for a number of reasons, some of which were addressed above. The other claims will now be addressed under the familiar Strickland standard.

Petitioner complains that counsel failed to file a motion to quash the amended indictment (on the grounds Petitioner argued in his direct attack on the indictment). The state court, during the post-conviction process, addressed the merits of Petitioner's attack and found it had no merit. Failure of counsel to raise meritless objections is not ineffective assistance. Clark v. Collins, 19 F.3d 959-966 (5th Cir. 1994).

Petitioner argues that counsel failed to interview prosecution witnesses Chaka and Rasheika Reed before trial. He claims that if counsel would have interviewed the Reed sisters, he would have learned that they were threatened by the state to provide false testimony to avoid being charged as principals. Petitioner also complains that counsel failed to answer his letters, visit him in jail, or return phone calls to family members. Petitioner represents that the witnesses would testify to these facts at a hearing. Petitioner made these same representations in his post-conviction application. Tr. 657.

The state's response to the post-conviction application included an affidavit from defense counsel, who testified that he had considerable criminal law experience, including several homicide jury trials. He said that, prior to trial, he had multiple conversations with Petitioner and received from him several items of correspondence. Counsel also testified that he had the use of a court-appointed investigator who was a retired homicide detective and

who investigated "several issues in this case." Counsel said that he worked in excess of 80 hours preparing for trial. He did not, however, say whether he or the investigator interviewed the Reed sisters or took any other specific actions before trial. The affidavit is simply general in nature. Tr. 671.

The district court issued the last reasoned decision on the Strickland claims. It said, with respect to this claim: "[Petitioner] further alleges that his attorney was unprepared. This allegation is not supported by anything in the record nor his post-conviction application. Thus, this claim is also without merit." Tr. 673.

Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 104 S.Ct. at 2066. The Fifth Circuit has held that failure to interview eyewitnesses constitutes deficient representation, and it has rejected an argument that vigorous cross-examination of the eyewitness at trial can cure the failure to interview the witness before trial. Anderson v. Johnson, 338 F.3d 382, 391 (5th Cir. 2003). But even if there has been defective performance, habeas relief is not warranted unless the poor performance caused prejudice – a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 104 S.Ct. at 2068; Anderson, 338 F.3d at 393.

Counsel's affidavit rebuts the contention that he did not speak with Petitioner before trial and that he did not employ an investigator. Petitioner has never submitted to any court evidence to the contrary. As for interviewing the Reed sisters, Chaka Reed testified on cross-

examination that defense counsel had spoken to her at a hearing earlier in the case. Tr. 305. (The referenced hearing may have been regarding a motion to suppress identification, but it does not appear the testimony from that hearing was transcribed and filed in this record.) Neither party points to more specific evidence on this issue, so we have Petitioner's conclusory assertion weighed against counsel's conclusory testimony that he conducted an investigation. Greater specificity in counsel's affidavit would have made the issue less close, but Petitioner has not satisfied his burden of presenting facts sufficient to warrant further proceedings regarding whether counsel conducted an adequate investigation. That is particularly true considering the heavy burden on petitioners who challenge state court factual findings.

Habeas relief is not permitted with respect to a claim adjudicated on the merits, with respect to a factual dispute, unless the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). State court findings of fact are presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. § 2254(e)(1). The assessment is based on the record that was before the state court. Holland v. Jackson, 124 S.Ct. 2736 (2004). And the presumption applies "even if the hearing was a 'paper' hearing and may not have been full and fair." Morrow v. Dretke, 367 F.3d 309, 315 (5th Cir. 2004). See also Valdez v. Cockrell, 274 F.3d 941, 948 (5th Cir. 2001)("a full and fair hearing [in state court] is not a prerequisite to the application of AEDPA's deferential framework"). As

noted above, Petitioner submitted no evidence to the state court to undermine counsel's affidavit and support his claim.

Petitioner has also failed to establish prejudice. He claims that the Reed sisters would say that they were threatened by the prosecution, but he does not say what testimony the Reed sisters would offer about Petitioner's role in the shooting. Petitioners who assert claims of recanting witnesses ordinarily provide affidavits from those witnesses. Even then, the affidavits are viewed with "extreme suspicion." Summers v. Dretke, 431 F.3d 861, 872 (5th Cir. 2005); U. S. v. Adi, 759 F.2d 404, 408 (5th Cir. 1985). Conclusory assertions in a petition and the absence of affidavits, despite litigation of the issue over a four-year period, must be viewed with even greater suspicion. There would be little time for anything else if the federal courts held a hearing every time a habeas petitioner claimed that the state's witnesses might now say something different. Petitioner has not established that the state court's factual findings were incorrect or that its decision of this claim was an objectively unreasonable application of Strickland.

Petitioner makes a similar claim that counsel should have obtained mitigating evidence about Petitioner's upbringing, functional skills and social status so that Petitioner would not be put to death if convicted as originally charged. Those issues might be relevant to a capital sentencing hearing, but the charge was reduced to a non-capital offense several months before trial. There is no prejudice in connection with this alleged failure.

Petitioner also makes a conclusory assertion that he could have provided "valuable and beneficial" (but wholly unspecified) information to help prepare a defense. Petitioner

also claims that family members could have testified that Petitioner did not have an Afro hairstyle on the day of the shooting. Once again, Petitioner has had more than four years of litigation of this contention in state and federal courts but has not produced any more specific facts or evidence to back the assertion and establish that the state court's decision was objectively unreasonable in light of the record before it.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **DENIED** and that Petitioner's complaint be **DISMISSED WITH PREJUDICE.**

## <u>Objections</u>

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this the 24th day of April, 2006.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE